**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| CORT THOMAS, as the Receiver for Carnegie Development, LLC, et al, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 3:24-cv-00612-X |
| HAOQIANG FU (A/K/A MICHAEL FU), PIC CONSULTANT, LLC, SILVERLAND FINANCE LIMITED, STEPHEN T. WALL, CARNEGIE HOMES, LLC, SASKYA BEDOYA ZUNIGA, TIMOTHY L. BARTON, VICTORIA L. BARTON, V STRATEGIES, LLC, MAXIMILIEN E. BARTON, MARTINE G. BARTON, SADA CUMBER, INDIVIDUALLY AND DBA PLUMBROOK GLOBAL CONSULTING COMPANY, MURUGAN VENKATACHALAM, INDIVIDUALLY AND DBA BROWARD ACCOUNTANTS, VINCAP, LLC, MARK ADAMS, | § | |
| Defendants. | § | |

**FIRST AMENDED COMPLAINT**

Cort Thomas, in his capacity as the court-appointed Receiver, files this First Amended Complaint against Haoqiang Fu (a/k/a Michael Fu, "Fu"), PIC Consultant, LLC ("PIC Consultant"), Silverland Finance Limited ("Silverland Finance Ltd."), Stephen T. Wall ("Wall"), Carnegie Homes, LLC ("Carnegie Homes"), Saskya Bedoya Zuniga ("Bedoya"), Timothy L. Barton ("Barton"), Victoria L. Barton, V Strategies, LLC, ("V Strategies") Maximilien E. Barton ("Max Barton"), Martine G. Barton, Sada Cumber ("Cumber"), individually, and dba Plumbrook Global Consulting Company, and Murugan Venkatachalam ("Venkat"), individually and dba

Broward Accountants, Vincap, LLC ("Vincap"), Mark Adams ("Adams") (collectively, "Defendants"). In support, the Receiver respectfully shows the Court the following:

## I.
## SUMMARY

1. This lawsuit seeks the recovery of more than $7.3 MM transferred to the Defendants by various "Receivership Entities" (defined below). Transfers to these Defendants were made by the Receivership Entities with intent to defraud the Entities' creditors, including investors whose funds were used to make the Transfers (defined below). The Transfers were made while the transferring Receivership Entities were insolvent, after significant and numerous lawsuits had been filed against them, while the Entities were concealing assets and transfers, without the exchange of reasonably equivalent value, and while the transferees (the Defendants) lacked good faith.

2. Standing in the shoes of the Receivership Entities' creditors for purposes of the claims asserted below, and for the benefit of the Entities' creditors, including the investors, the Receiver seeks to recover the funds transferred to the defendants named herein.

## II.
## PARTIES

3. Plaintiff Cort Thomas, in his capacity as Receiver ("Receiver") as defined below, is an individual who resides in the State of Texas.

4. Defendant Haoqiang Fu (a/k/a Michael Fu) is an individual who may be served with process at 9019 Blanefield Ln, Tomball, Texas 77375, or wherever else he may be found.

5. Defendant PIC Consultant, LLC is a domestic limited liability company, which can be served through its registered agent of record, Jin Wang, 9019 Blanefield Ln, Tomball, Texas 77375. Upon information and belief, Fu operated by and through PIC Consultant, LLC.

6. Upon information and belief, Defendant Silverland Finance Limited a/k/a Silverland Management Limited is a foreign corporation incorporated in the Marshal Islands which can be served through its agent Haoqiang Fu (a/k/a Michael Fu) who may be served with process at 9019 Blanefield Ln, Tomball, Texas 77375, or wherever else he may be found. Upon information and belief, Fu operated by and through Silverland Finance Limited.

7. Defendant Stephen T. Wall is an individual who may be served with process at 1011 Red Wing Ct., Mansfield, Texas 76063, or wherever else he may be found.

8. Defendant Carnegie Homes, LLC, is a Delaware limited liability company which may be served with process through its registered agent InCorp, 3773 Howard Hughes Parkway, Suite 5005, Las Vegas, Nevada 89169, or wherever else it may be found.

9. Defendant Saskya Bedoya Zuniga is an individual who may be served with process at 2736 Trophy Club Dr., Roanoke, Texas 76262, or wherever else she may be found.

10. Defendant Timothy L. Barton is an individual who may be served with process at 6041 Village Bend Dr., Apt 111 Dallas, TX 75206, or wherever else he may be found.

11. Defendant Victoria L. Barton is an individual who may be served with process at 7109 Rembrandt Dr., Plano, Texas 75093, or wherever else she may be found.

12. Defendant V Strategies, LLC, is a Delaware limited liability company which may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808, or wherever else it may be found.

13. Defendant Maximilien E. Barton is an individual who may be served with process at 3926 Vista Woods Dr., Carrolton, Texas 75007, or wherever else he may be found.

14. Defendant Martine G. Barton is an individual who may be served with process at 7109 Rembrandt Dr., Plano, Texas 75093, or wherever else she may be found.

15. Defendant Sada Cumber is an individual who may be served with process at 1410 Sugar Creek Blvd., Sugarland, Texas 77478, or wherever else he may be found. Upon information and belief, Cumber also utilized "Plumbrook Global Consulting Company" as an assumed name.

16. Defendant Murugan Venkatachalam is an individual who may be served with process at 5516 Taft Street, Hollywood, Florida 33021 or wherever else he may be found. Upon information and belief, Venkat also utilized "Broward Accountants" as an assumed name.

17. Defendant Vincap, LLC is a limited liability company which may be served with process through its registered agent, Mark Adams, 1920 McKinney Ave., 7th Floor, Dallas, Texas 75201, or wherever else it may be found.

18. Defendant Mark Adams is an individual who may be served with process at 6728 Mossvine Place, Dallas, Texas 75254, or wherever else he may be found.

## II.
## JURISDICTION AND VENUE

19. The court has ancillary subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and the November 29, 2023 Order Appointing Receiver ("Receivership Order") issued in the "Underlying Lawsuit" (defined below). Pursuant to the Receivership Order,[1] the Court has assumed exclusive custody and control over all Receivership Assets, which include all claims owned by the Receivership Entities, including the claims asserted below. This lawsuit is filed pursuant to the Receiver's execution of his duties as defined in the Receivership Order to recover funds owed to the Receivership Entities, and accordingly, ancillary jurisdiction exists regardless of amount in controversy, diversity, or any other factor.[2]

[1] A true and correct copy of the Receivership Order is attached as **Exhibit A** and is incorporated by reference.

[2] *Crawford v. Silette*, 608 F.3d 275, 278 (5th Cir. 2010).

20. Further, the Court has subject matter jurisdiction and personal jurisdiction over each of the Defendants pursuant to 28 U.S.C. § 1692 and 28 U.S.C. § 754.

21. Venue in this District is proper pursuant to 28 U.S.C. §1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in Dallas, Texas. Moreover, because ancillary jurisdiction exists, ancillary venue also exists.[3]

## III. CONDITIONS PRECEDENT

22. All conditions precedent to the filing of this Original Complaint and/or the Receiver's recovery have been performed or have occurred.

## IV. BACKGROUND FACTS

### A. The Receivership

23. As discussed below, the SEC filed a lawsuit against Timothy Barton and others, in which it asserted that the defendants had violated SEC regulations in connection with securities offerings regarding real property investments.[4] The lawsuit was styled *SEC v. Barton, et al.*, Cause No. 3:22-CV-02118-X, and is pending in the United States District Court for the Northern District of Texas, (the "Underlying Lawsuit").

24. In the Underlying Lawsuit, the SEC alleged Barton, through various entities he controlled, misappropriated funds transferred by investors for the purchase of specific real estate properties (the "Investments").[5]

---

[3] *SEC v. Bilzerian*, 378 F.3d 1100, 1107 (D.C. Cir. 2004).

[4] Timothy Barton, Michael Fu, and Stephen T. Wall have also been indicted in connection with their role in investment fraud.

[5] A true and correct copy of the SEC's Complaint is attached as **Exhibit B,** and its allegations are incorporated herein by reference.

25. On October 18, 2022, in the Underlying Lawsuit and pursuant to the SEC's motion, Cort Thomas was appointed as Receiver for various "Receivership Entities." On November 29, 2023, following an additional motion, briefing, and an evidentiary hearing, Mr. Thomas was reappointed as Receiver, pursuant to a new Receivership Order (the "Receivership Order"), for a substituted set of Receivership Entities.[6]

**B. Fraudulent Concealment and Diligent Efforts to Discover the Claims Asserted**

26. Pursuant to his investigation and despite every effort by Defendant Barton to conceal and withhold information, including access to information related to the Receivership Entities' books and records, the Receiver has discovered claims for the recovery of Receivership Assets, and asserts those claims below.

27. The Receiver's claims, including the fraudulent nature of the Transfers discussed below, were actively concealed, and despite diligence, the Receiver was not able to discover his claims until recently.

28. More specifically, Barton withheld access credentials to the Receivership Entities' servers, accounting system, and email accounts until the Court ordered him to provide that information to the Receiver. Barton also utilized IT professionals to frustrate any investigation

[6] The motion for appointment and supporting evidence, the renewed motion for appointment, and supporting evidence, and all evidence admitted in support of the motion for reappointment are also incorporated herein by reference. *See* Underlying Lawsuit, Dkt. Nos. 6, 7, 309, 310. As provided in the Receivership Order, the Receivership Entities are: 126 Villita, LLC, 2999TC Acquisitions LLC, 2999TC JMJ CMGR, LLC (Delaware), AVG West, LLC, BEE2019, LLC, BM318, LLC, Broadview Holdings Trust, Carnegie Development, LLC, D4DS LLC, D4FR LLC, D4IN, LLC (Texas), D4KL, LLC, D4MC, LLC (Texas), D4OP, LLC, DJD Land Partners, LLC, Enoch Investments, LLC, FHC Acquisition, LLC, Gillespie Villas, LLC, Goldmark Hospitality, LLC, HR Sterling, LLC, JMJ Acquisitions, LLC, JMJ Development LLC (f/k/a JMJ Development, Inc.), JMJ Hospitality, LLC, JMJ VC Management, LLC, JMJAV, LLC, JMJD4, LLC (Delaware), JMR100, LLC, LaJolla Construction Management, LLC, LC Aledo TX, LLC, LDG001, LLC, Lynco Ventures, LLC, Mansions Apartment Homes at Marine Creek, LLC, Marine Creek SP, LLC, MO 2999TC, LLC, Northstar PM, LLC (Texas), Orchard Farms Village, LLC, Ridgeview Addition, LLC (Texas), Seagoville Farms, LLC, SF Rock Creek, LLC, TC Hall, LLC, Titan Investments, LLC a/k/a Titan 2022 Investments, LLC, Venus59, LLC, Villita Development, LLC, Villita Towers, LLC, WALL007, LLC, WALL009, LLC, WALL010, LLC, WALL011, LLC, WALL012, LLC, WALL016, LLC, WALL017, LLC, WALL018, LLC, WALL019, LLC, WRL2019, LLC (Texas).

into his and the Receivership Entities' finances by transferring information to cloud-based servers and directing the IT professionals to withhold access from the Receiver.

29. Even after he obtained access to certain QuickBooks accounts, however, the Receiver and his accountants were unable to fully discover the claims asserted herein because, among other things, (a) the QuickBooks records were incomplete which necessitated obtaining and evaluating thousands of pages of bank records and financial and related records from title companies and other persons and entities; (b) Barton operated and controlled more than 160 entities, which were initially all Receivership Entities, and commingled assets between and among those entities extensively rendering evaluation of the financial records and Transfers complex and time-consuming; (c) entries in the Receivership Entities' accounting records appeared in many instances to have been made to conceal the actual activity that occurred, for instance by moving money through many accounts in one day to conceal the origin of the funds; (d) the Receiver could not (and still cannot) access electronic communications between the Receivership Entities and Defendants as a result of Barton's complaints about potential personal privilege in those documents, and Barton refused to agree to, and opposed the Receiver's proposal, for a privilege protocol to review those materials; (e) because Barton interfered with and precluded the sale of any real property, once the Court established the privilege protocol, the Receivership Estate lacked funds to pay an IT vendor and reviewing counsel to perform the privilege review; (f) the Receiver's investigation into the factual basis for the claims was delayed and impeded at every turn by Barton's refusal to comply with the Receivership Order by providing the information required of him; (g) the Fifth Circuit's vacatur of the original Receivership Order and instruction to this Court to consider a new Receivership Order necessitated focusing on tracing to identify which Receivership Entities received or benefitted from Investor Funds;  and, (h) the Receiver and his

counsel were required to address other matters required to perform the Receiver's appointment, for instance, efforts to continue the operations of the Amerigold Suites, responding to pressing creditors who sought to lift the litigation stay, and in several instances, mediating with them, the lengthy summary judgment practice involving a lender's interest in four apartment properties, and addressing Barton's repeated motions and appeals intended to stay administration of the receivership.

30. Although the Receiver asserts claims for the recovery of certain fraudulent transfers below, the precise manner, dates, and amounts, and recipients of additional fraudulent transfers is known only to Defendants, and absent additional discovery and a detailed analysis by an expert, the Receiver is unable to discover those fraudulent transfers.

**C. Numerous Receivership Entities Received Investor Funds**

31. As set forth in the Commission's Complaint, in the Underlying Lawsuit the SEC alleged that from approximately March 2017 through June 2019, Barton, together with Fu and Wall, raised approximately $26 million from over 100 investors (the "Investors" and "Investor Funds") in unregistered, fraudulent securities offerings related to Texas real-estate investments.[7]

32. To implement his scheme, Barton partnered with Stephen T. Wall, an experienced Texas home builder, and "Michael" Fu, a Chinese businessman, to offer and sell investment loans issued by a series of single purpose "Wall" entities (the "Wall Entities"). In connection with the scheme, Barton also formed and controlled Carnegie Development, LLC ("Carnegie"),[8] which served as the managing member of each of the Wall entities. Barton through Carnegie, on behalf of each Wall Entity, signed the respective loan agreements with each Investor.

[7] *See* SEC Complaint, ¶ 1. Barton has not answered the SEC's Complaint and the Underlying Lawsuit is stayed while until the criminal charges against Barton are resolved. *See* Dkt. 1, Underlying Lawsuit.

[8] Later, Carnegie Development, Inc. was also purchased, again, in furtherance of Barton's fraud.

33. Upon information and belief, Barton formed and controlled the Wall Entities. In the loan agreements with the Investors, Barton promised that the Investor's Funds, together with funds from the Wall Entities themselves, would be used to purchase specific parcels of land at specific prices set forth in the offering materials. Barton promised he would then develop that land into residential lots, and Wall would build homes on the lots and sell them.

34. Once the loan agreements were executed, the Investors generally transferred their Investment Funds either to a bank account in the name of the respective Wall Entity in which they were investing, Carnegie, or in a few instances, accounts in the name of other Receivership Entities.

35. The Wall Entities promised Investors they would receive their principal back in two years along with annual interest payments.

36. Upon information and belief, with the assistance of one or more of the Defendants, Barton, Wall, and Fu, however, inflated the land purchase prices in the offering materials, which enabled them to raise more money from Investors; overstated the value of the assets securing the investments; and concealed that the Wall Entities were not actually contributing any funds.

37. Barton, through Receivership Entities including but not limited to JMJ Development, LLC, Broadview Holdings, LLC, Goldmark Hospitality, LLC, Carnegie Development, LLC, and JMJAV, LLC, then misappropriated nearly all the Investor Funds, misusing them to, among other things, purchase properties in the name of other entities he controlled, pay undisclosed fees and commissions to Fu, pay expenses associated with unrelated real estate development projects, pursue and defend litigation involving other properties, including paying legal fees related to those lawsuits, and fund his lifestyle.

38. None of the "other projects" for which Investor Funds were used, i.e., to purchase

properties other than as disclosed to the Investors, generated any income.

39. Through various Receivership Entities, Barton spent or otherwise misappropriated approximately $23.7 million of Investor Funds, including through Transfers to the Defendants in this lawsuit.

40. The Wall Entities were left with little or no assets, the projects were not developed, and the Investors did not receive their promised returns.

41. Barton, Fu, and Wall have each been indicted based on the same conduct.

42. Bedoya, who was Barton's assistant but was also "Vice President of Operations" for Receivership Entity JMJ Development, LLC, has also been indicted.

**D. Transfers to the Defendants**

43. The Defendants in this lawsuit and their respective legal entities, Fu (individually and through the entities he controlled, PIC Consultant, LLC and Silverland Finance Limited), Stephen T. Wall (individually and through the entity he controlled Carnegie Homes, LLC), Saskya Bedoya Zuniga, Timothy L. Barton, Victoria L. Barton (individually and through the entity she controlled, V Strategies, LLC), Maximilien E. Barton, Martine G. Barton, Sada Cumber, (individually and dba Plumbrook Global Consulting Company), Murugan Venkatachalam, (individually and dba Broward Accountants), Adams (individually and through the entity he controlled, Vincap), received transfers of Investor Funds from various Receivership Entities, as initial transferees, persons for whose benefit such transfers were made, or as subsequent transferees.

44. At all relevant times, the primary or only funds available to make the Transfers to these Defendants were Investor Funds.

45. Upon information and belief, and except for Goldmark Hospitality, LLC which

operated the Amerigold Suites (generally at a loss) during the relevant time period, none of the Receivership Entities generated any net income for payment of even ordinary operating expenses.

46. Between January of 2017 and October of 2022, in total, these Defendants received or received the benefit of not less than $ 7.3 MM in Transfers made from various Receivership Entities.

47. In most instances, the funds represented by the Transfers were Investor Funds or the proceeds of Investor Funds.

48. Each Transfer was made with actual or constructively fraudulent intent by the transferring Receivership Entity.

**i. Tim Barton**

49. Almost immediately upon receipt of the first Investor Funds, Barton began misappropriating those funds for his own uses.

50. Using Receivership Entities that he controlled, Barton used Investor Funds to pay personal expenses, such as meals, car payments, airplane repair expenses, payments to his ex-wife and children, and mortgage payments on the residence in which he lived (in violation of the loan documents for the Rock Creek Property[9]).

51. Although some of the Transfers were not made to Barton personally, all were made for his benefit. For instance, Barton incurred personal charges on credit cards, which in turn were paid through Transfers.

52. The Receivership Entities that made these Transfers for Barton's benefit varied, but upon information and belief, no Receivership Entity that made Transfers for Barton's benefit

[9] The Rock Creek Property is a home located 4107 Rock Creek Drive Dallas, Texas owed by Receivership Entity SF Rock Creek, LLC.

received any reasonably equivalent value in exchange. Instead, the Entities paid debts owed or incurred by or for Barton's benefit and to support his lifestyle.

83. Between March 3, 2017 and October 7, 2022, Transfers in an amount not less than $680,473.18 made from various Receivership Entities were made to Barton or for Barton's benefit. A true and correct copy of a summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to or for the benefit of Barton is attached as **Exhibit C**.

**ii. <u>Fu</u>**

53. Upon information and belief, Fu was well-aware that Investor Funds were being misappropriated and used to pay him. He was aware of this fact, because on information and belief, he directed many of the Transfers he received, from the specific Wall Entity accounts or otherwise.

54. Fu was also aware of lawsuits filed by Investors against him, the entities he controlled, Barton and the Wall Entities, alleging misappropriation of the Investor Funds and other improper or fraudulent activities, involving the very funds from which he received the Transfers.

55. Between March 14, 2017 and May 6, 2019, Transfers in an amount not less than $3,669,158.14 made from various Receivership Entities were made to or for the benefit of Fu. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Fu is attached as **Exhibit D**.

56. In addition, or in the alternative, Transfers made to Silverland Finance, Ltd., PIC Consultant, LLC, Gate Greece Properties, and the National Bank of Greece were also made for the benefit of Fu.

57. In the further alternative, and upon information and belief, Fu is a subsequent transferee of all Transfers made to Silverland Finance, Ltd., PIC Consultant, LLC, Gate Greece

Properties, and the National Bank of Greece.

**iii. <u>Wall</u>**

58. Between September 24, 2018 and March 29, 2019, Transfers in an amount not less than $285,761.03 made from various Receivership Entities were made to Carnegie Homes, LLC for the benefit of Wall. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Wall is attached as **Exhibit E**.

59. In addition, or in the alternative, upon information and belief, Wall is a subsequent transferee of all Transfers made to Carnegie Homes, LLC.

**iv. <u>Bedoya-Zuniga</u>**

60. Bedyoa-Zuniga was in large part responsible for making transfers between and among the Receivership Entities' accounts and in most instances, to or for the benefit of other Defendants.

61. For instance, during testimony before the SEC, Bedoya reviewed several bank statements and admitted making numerous transfers out of accounts owned by the Wall entities into which the Investors had transferred their funds, for use in other projects and other accounts including accounts owned by Carnegie Development, JMJ Development, and Villita Towers, LLC. Additionally, Bedoya confirmed having used funds from the Wall entities to pay, among other things, development expenses at other properties, commissions for Wall or Fu, and Barton's personal American Express charges.

62. These uses were not permitted by the loan agreements signed by the Investors and Barton on behalf of Carnegie Development.

63. Upon information and belief, Bedoya-Zuniga also knew that Transfers she received were also comprised of Investor Funds or the proceeds of Investor Funds.

64. Further, Bedoya-Zuniga was acutely aware of the insolvency of the Receivership Entities because she was generally charged with moving funds from one account to another to maintain the illusion of income, profitability and liquidity.

65. Between January 11, 2017 and October 31, 2022, Transfers in an amount not less than $541,402.86 made from various Receivership Entities were made to or for the benefit of Bedoya-Zuniga. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Bedoya-Zuniga is attached as **Exhibit F**.

**v. Victoria Barton**

66. Victoria Barton is Tim Barton's adult daughter. Ms. Barton was neither employed by nor contracted to any Receivership Entity but she officed in the same building as all other Receivership Entities. Despite the absence of any value provided by Victoria Barton, Receivership Entities purchased a car for Ms. Barton, paid her car insurance, and funded her lifestyle.

67. Between November 5, 2018 and June 16, 2022, Transfers in an amount not less than $29,519.00 made from various Receivership Entities were made to or for the benefit of Victoria Barton. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Vicotria Barton is attached as **Exhibit G**.

68. In addition or in the alternative, Transfers made to V Strategies, Citi Card, and Comenity were also made for the benefit of Victoria Barton.

69. In the further alternative, and upon information and belief, Victoria Barton is a subsequent transferee of all Transfers made to V Strategies.

**vi. Max Barton**

70. Upon information and belief, for at least some period of time, Max Barton purported to manage Receivership Entity Goldmark Hospitality, LLC and its property, the

Amerigold Suites. He was not successful in his management efforts, however, and at some point, his father Tim resumed control of the entity and property.

71. Max Barton also purported to assist Barton in development efforts for other properties (again, with Investor Funds or the proceeds of those Funds), or upon information and belief, attempted to develop or otherwise acquire other properties (still with Investor Funds or their proceeds) at the direction and for the benefit of Barton.

72. Regardless of any services Max Barton purported to provide to Goldmark Hospitality, LLC, he received Transfers from many other Receivership Entities, again, from Investor Funds or their proceeds. None of the Receivership Entities that made Transfers to or for the benefit of Max Barton received reasonably equivalent value, if any, in exchange.

73. Between October 15, 2019 and September 23, 2022, Transfers in an amount not less than $62,872.70 made from various Receivership Entities were made to or for the benefit of Max Barton. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Max Barton is attached as **Exhibit H**.

74. The services, if any, provided by Max Barton to any Receivership Entity were not the reasonably equivalent value of the Transfers he received, nor were services provided or Transfers made in arms-length, commercially reasonable transactions. Further, services, if any, provided by Max Barton, were not provided to the Receivership Entit(ies) that made the Transfers to him.

**vii. Martine Barton**

75. Martine Barton is Barton's ex-wife. She provided no services or value to any Receivership Entity, yet received substantial payments, again from Investor Funds.

76. Between March 20, 2017 and December 13, 2018, Transfers in an amount not less

than $781,074.89 made from various Receivership Entities were made to American Express for the benefit of Martine Barton. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Martine Barton is attached as **Exhibit I**.

**viii. <u>Cumber</u>**

77. Upon information and belief, in response to a lawsuit filed by Investors and Fu against Barton and certain Receivership Entities,[10] Defendants or one of them determined that using a different entity, Carnegie Development, Inc., ("CDI") a public company, and offering the Investors shares in Carnegie Inc. rather than repaying their investments, would pacify the Investors while at the same time converting the Investors' Funds into assets held by CDI.

78. In approximately September of 2019, shortly after Barton acquired CDI, Cumber was appointed or designated as the President and CEO of CDI.

79. Upon information and belief, CDI was never capitalized and at least while under Cumber's control, never operated in any meaningful way.

80. Upon information and belief, while serving as CDI's President, in the summer of and fall of 2019, Cumber purported to serve as a mediator in the Silverland Lawsuit.

81. Upon information and belief, Cumber's direct and critical conflict of interest was never disclosed to the Investors or Fu, who were adverse to Barton in the Silverland Lawsuit.

82. As a result of his involvement in the Silverland Lawsuit, Cumber was, however, well aware of at least the contention that Investor Funds were being misappropriated.

83. Upon information and belief, Cumber had knowledge or notice of many additional suspicious facts or wrongful activities related to the Investors and the Investor Funds.

---

[10] *Silverland Finance, Ltd. et al v. Wall07 et al.*, Cause No. DC-19-18361 in the 44th District Court for Dallas County, (the "Silverland Lawsuit").

84. Between February 15, 2019 and March 5, 2020, Transfers in an amount not less than $521,767.79 made from various Receivership Entities were made to Cumber. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Cumber is attached as **Exhibit J**.

85. In addition, or in the alternative, Transfers made to Plumbrook Global Consulting were also made for the benefit of Cumber.

86. In the further alternative, and upon information and belief, Cumber is a subsequent transferee of all Transfers made to Plumbrook Global Consulting.

**ix. <u>Venkat</u>**

87. Venkat was head of an internal accounting group tasked with assisting Barton in concealing the uses and disposition of Investor Funds for purposes other than as permitted by the loan agreements.

88. Upon information and belief, Venkat led efforts to remove accounting information from the Receivership Entities' QuickBooks accounts from both local and network locations and to instead move those accounting records into a remote or cloud-based format that would not be readily discoverable or accessible by third parties. Upon further information and belief, Venkat also created or directed other individuals to create a false accounting trail of "inter-company loans" or other justifications for Barton's improper use of the Investor Funds.

89. Upon information and belief, Venkat was aware of (a) the SEC's investigation; (b) lawsuits by Investors; and (c) many, many, improper, irregular, and suspicious accounting practices involving the Investors Funds.

90. Between September 6, 2018 and April 19 2022, Transfers in an amount not less than $393,296.10 made from various Receivership Entities were made to Venkat. Venkat also

received housing from the Receivership Entities and lived on-site at 2999 Turtle Creek Boulevard. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Venkat is attached as **Exhibit K**.

91. In addition, or in the alternative, Transfers made to Broward Accountants were also made for the benefit of Venkat.

92. In the further alternative, and upon information and belief, Venkat is a subsequent transferee of all Transfers made to Broward Accountants.

**x**. **Adams**

93. In July of 2020, during sworn testimony, Tim Barton described Mark Adams as an "employee of JMJ for close to 15 years and he was in charge of capital markets as the capital markets officer. His responsibilities were to deal with any capital source that was coming in in the form of an investment [or] a loan."[11]

94. Upon information and belief, Adams was aware that (a) Investor Funds were being misappropriated for uses other than as permitted in the Investors' respective loan agreements; (b) lawsuits by Investors alleging the misappropriation of their funds; and (c) many, many, improper, irregular, and suspicious practices involving the Investors Funds.

95. Between April 4, 2017 and April 6, 2020, Transfers in an amount not less than $469,729.00 made from various Receivership Entities were made to or for the benefit of Adams. A true and correct summary reflecting the dates, amounts, manner of transfer, and the specific entity that transferred funds to Adams is attached as **Exhibit L**.

96. In addition, or in the alternative, Transfers made to Vincap were also made for the

[11] *LDG001, LLC v. Southern Star Capital, LLC*, No. DC-C202000421 (249th Dist. Ct., Johnson Cnty, Tex. July 29, 2020).

benefit of Adams.

97. In the further alternative, and upon information and belief, Adams is a subsequent transferee of all Transfers made to Vincap.

**E. The Transfers Were Made With Fraudulent Intent**

98. In many instances, the respective Receivership Entities that made the Transfers to each Defendant did not receive reasonably equivalent value from the respective transferee Defendant.

99. Instead, some Defendants provided services, if any, to one or more Receivership Entities, while receiving Transfers or their benefit, from a different Receivership Entity, which accordingly, received no value for any services provided by Defendants.

100. Each Defendant was an "insider."

101. Through the manner in which these Transfers were made or otherwise, the Transfers were concealed.

102. Through the manner of their operation, including the extensive co-mingling of assets and multiple transfers in and out of various Receivership Entities on the same day in the manner of money-laundering, the Receivership Entities concealed assets.

103. Each Receivership Entity made the Transfers to Defendants to continue the fraud Barton and the Receivership Entities were committing against the Investors, lenders, and other creditors.

104. In some instances, Defendants' services were utilized, upon information and belief with Defendants' knowledge, solely to hinder, delay or defraud creditors.

105. At the time each Transfer was made to each respective Defendant, the transferring Receivership Entity was unable to pay its debts as they became due.

106. Further, debts owed by and claims against each Receivership Entity greatly exceeded each Entity's assets (if any).

107. At the time each of the Transfers was made, several of the Receivership Entities, including the Wall Entities, were, or had been, subject to bankruptcy proceedings. Indeed, in the 18 months before October 29, 2021, Receivership Entities or their affiliates had filed for bankruptcy or were involuntarily placed in bankruptcy no fewer than 16 times.

108. Similarly, at the time each of the Transfers was made, several of the Receivership Entities, including the Wall Entities, had been sued.

109. Transfers made to the Defendants also rendered the Receivership Entities unable to pay a myriad of additional creditors, including the Investors.

110. Defendants knew or should have known that the Transfers each received were made with actual fraudulent intent.

**F. Defendants Received Fraudulent Transfers While In Possession of Facts Negating Good Faith**

111. The notice or knowledge possessed by Defendant regarding the actual or constructive fraudulent intent with which the Transfers were made is known to each respective Defendant. Nonetheless, based on their respective roles, their participation in soliciting investments from the Investors or creating the offering materials (Barton, Wall, and Fu) operating the Receivership Entities or creating their accounting records, (Barton, Bedoya-Zuniga, Max Barton, Venkat), their role as "insiders" (all Defendants), Defendants had at least inquiry notice of the fraudulent intent underlying the Transfers made to each and to each other.

112. Upon information and belief, each Defendant was also privy to information underlying the SEC's claims by which they had, at a minimum, notice of the fraudulent intent behind the Transfers each received.

113. Payments to Defendants were one such impermissible use of Investor Funds by the various Receivership Entities.

## V.
## CLAIMS FOR RELIEF

**COUNT 1: FRAUDULENT TRANSFER- Actual Fraud (all Defendants)**

114. The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 113 of this Original Complaint as if each were separately set forth herein.

115. On the dates, in the amounts, and in the manner described in **Exhibits C through L**, the Receivership Entities transferred the specific amounts to each of the Defendants (collectively, "the Transfers") with intent to defraud the Receivership Entities' creditors, who include, but are not limited to, the Investors.

116. As demonstrated by numerous badges of fraud, the Receivership Entities made the Transfers with actual fraudulent intent:

a. As payments made to facilitate fraud and which resulted in claims held by Investors exceeding the value, if any, of the services provided by each of the Defendants, the Transfers were not made in exchange for reasonably equivalent value. *See S.E.C. v. Resource Dev. Int'l, LLC,* 487 F.3d 295, 301 (5th Cir.2007) (citing *In re Agric. Res. & Tech. Group, Inc.*, 916 F.2d 528, 540 (9th Cir.1990) (Value is assessed in light of the statute's purpose "to protect the creditors"));

b. The Transfers and their amounts were concealed from creditors;

c. The Receivership Entities concealed assets, including by diverting monies received from Investors for specific real estate purchases to a myriad of shell entities, and bank accounts;

d. Each Defendant was an "insider;"

e. The Transfers were made when the Receivership Entities were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed or reasonably should have believed that the Receivership Entities would incur, debts beyond their ability to pay as they became due;

f. The Receivership Entities' debts—including but not limited to claims held by defrauded Investors—greatly exceed their assets;

g. Many Transfers were made after the respective transferring Receivership Entity had been sued, or after the SEC had begun its investigation;

h. Many Transfers were made shortly after substantial debts were incurred;

i. The Receivership Entities engaged in a pattern of sharp dealing, by among things, using the Defendants to file baseless lawsuits intended to tie up ownership of properties the purchase of which the Receivership Entities had defaulted on;

j. At the time of each of the Transfers, the transferring Receivership Entities had actual knowledge or notice that by making the Transfers, they would be unable to pay creditors, including claims held by defrauded Investors. *See Hayes v. Palm Seedlings Partners–A (In re Agricultural Research and Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (Holding knowledge that a transaction will operate to the detriment of creditors may be sufficient to establish actual fraudulent intent);

k. At the time of each Transfer, each of the Receivership Entities was part of a fraudulent enterprise. Thus, a presumption of fraudulent intent attached to each of the

Transfers. *See In re IFS Fin. Corp.*, 417 B.R. 419, 439 n.15 (Bankr. S.D. Tex. 2009), *affirmed,* 669 F.3d 255 (2012); and

l. Through their accounting practices and otherwise, the transferring Receivership Entities concealed assets as well as the Transfers.

117. Moreover, no Defendant was acting in good faith when he, she, or it received the Transfers since, upon information and belief, each Defendant was aware or had notice of (a) the transfer of Investor funds from Wall Entities and Carnegie to other Receivership Entities; (b) that the only funds available to any Receivership Entity from which Defendants could have been paid were Investor Funds; (c) he or she was being paid by Receivership Entities which either had no assets or insufficient assets to pay their respective bills; (d) complaints from and/or lawsuits filed by Investors regarding the treatment and disposition of Investor funds; (e) complaints from and/or lawsuits filed by creditors regarding Barton and the Receivership Entities' misappropriation, sharp or fraudulent business practices; and (f) the SEC's investigation.

118. Creditors, including, but not limited to Investors, exist whose claims arose before and/or within a reasonable time after the Transfers were made, and for whose benefit the Receiver is authorized to assert these claims.

119. Despite the exercise of diligence, the Receiver was unable to discover this claim until, at the earliest, the late spring or early summer of 2023.

120. Because the Transfers from the Receivership Entities to the Defendants were fraudulent under TUFTA § 24.005(a)(1), the Receiver may avoid the Transfers.

121. The Receiver requests all available remedies provided by TUFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to Defendants and recovery of reasonable and necessary attorney's fees.

**<u>COUNT 2</u>: FRAUDULENT TRANSFER- Constructive Fraud (all Defendants)**

122. The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 113 of this Original Complaint as if each were separately set forth herein.

123. The Transfers were made when the Receivership Defendants were (a) engaged or about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction; or (b) when the Receivership Entities intended to incur, or believed, or reasonably should have believed, that the Receivership Entities would incur, debts beyond their ability to pay as they became due.

124. The services allegedly provided by any Defendant provided no value to the respective transferor Receivership Entity and instead simply enlarged the pool of defrauded investors and creditors who hold claims against the Receivership Entities. The Receivership Entities, accordingly, did not receive reasonably equivalent for the Transfers.

125. The Transfers were thus fraudulent pursuant to TUFTA § 24.005(a)(2) and §24.006, et seq.

126. Creditors, including, but not limited to Investors, exist whose claims arose before and/or within a reasonable time after the Transfers were made, and for whose benefit the Receiver is authorized to assert these claims.

127. The Receiver requests all available remedies provided by the UFTA, including, but not limited to, avoidance of all transfers of monies and property from the Receivership Entities to the Defendants within the four years preceding the date on which this Complaint is filed, and the recovery of reasonable and necessary attorney’s fees.

**<u>COUNT 3</u>: UNJUST ENRICHMENT - CONSTRUCTIVE TRUST (all Defendants)**

128. The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 113 of this Original Complaint as if each were separately set forth herein.

129. Defendants have been unjustly enriched by the Transfers and property they received from the Receivership Entities.

130. The Receivership Entities owe restitution to the Investors, and the Defendants' retention of the Transfers is unjust and injures the Receivership Entities.

131. Accordingly, the Receiver seeks to recover from the Defendants such amounts for the benefit of creditors and defrauded Investors under the equitable doctrine of unjust enrichment and requests the imposition of a constructive trust over all such funds, property and the proceeds thereof.

**<u>COUNT 4</u>: MONEY HAD AND RECEIVED (all Defendants)**

132. The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 113 of this Original Complaint as if each were separately set forth herein.

133. The Defendants received the Transfers and other property from the Receivership Entities, that in equity and good conscience belong to the Receivership Entities. The Receiver seeks to recover the Transfers and other property for the benefit of the Investors and other creditors of the Receivership Entities.

134. The Receiver sues for the recovery of all monies had and received by the Defendants.

**<u>COUNT 5</u>: REQUEST FOR AN ACCOUNTING (all Defendants)**

135. The Receiver alleges and hereby incorporates by reference each and every allegation made in Paragraphs 1 through 113 of this Original Complaint as if each were separately set forth herein.

136. The Defendants are in wrongful possession of substantial monies transferred to them by Receivership Entities, which was obtained by the Receivership Defendants from the Investors, through fraudulent and misleading means. The Defendants have each been provided a copy of the Receivership Order which requires their cooperation, and the Receiver requests that each Defendant identify the bank accounts in which the Transfers each received are held, or to fully account for the use of the funds transferred to each. The Receiver is entitled to an accounting specifying the location of the Transfers, the persons or entities with control over the Transfers or their proceeds, and the location of any assets purchased with the Transfers.

137. The Receiver requests that the Court enter an Order compelling the Defendants to file with the Court and serve upon the Receiver an accounting, under oath, detailing all of their assets and all of their funds and other assets received from the Receivership Entities.

## VI.
## <u>ATTORNEY'S FEES</u>

138. The Receiver seeks the recovery of all reasonable attorneys' fees and expenses incurred in obtaining judgment against each of the Defendants, as allowed by law or in equity, and those attorneys' fees and expenses required to pursue any appeal.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Receiver, Cort Thomas respectfully prays that this Court order disgorgement or alternatively award the Receiver judgment against each Defendant in an amount to be determined through discovery, plus prejudgment and post judgment interest, attorneys' fees, expenses, and court costs; order an accounting as requested herein; and that the Court grant such other and further relief as prayed for herein, both at law and in equity, to which he may show himself justly entitled.

Respectfully submitted,

By: *\/s/ Charlene C. Koonce*

Charlene C. Koonce
State Bar No. 11672850
charlene@brownfoxlaw.com
C. Alan Carrillo
State Bar No. 24109693
alan@brownfoxlaw.com
Timothy B. Wells
Texas Bar No. 24131941
tim@brownfoxlaw.com
BROWN FOX PLLC
8111 Preston Road, Suite 300
Dallas, Texas 75225
T: (214) 327-5000
F: (214) 327-5001

*Attorneys for Receiver Cortney C. Thomas*